**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-343 (LLA)** |
| **Andy Steven Oliva-Lopez,** | |
| **Defendant.** | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Andy Steven Oliva-Lopez to 63 months of incarceration, at the mid-point of the advisory guideline range of 51 to 63 months, 36 months of supervised release, $2,000 in restitution, and the mandatory special assessment of $100.

## I.    INTRODUCTION

The defendant, Andy Steven Oliva-Lopez, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] Oliva-Lopez was a ready, willing, and enthusiastic participant in the chaos that gripped

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

the Capitol on January 6.

Oliva-Lopez drove with a friend from the west coast to Washington, D.C. to attend the "Stop the Steal" rally.   After the rally, he marched to the Capitol.   Once at the Capitol, Oliva-Lopez made his way to the West Plaza where police officers were struggling to maintain defensive lines and prevent the mob from advancing to the Capitol building itself.   Oliva-Lopez had come prepared to wreak havoc; he was wearing a full-face respirator and a military-style helmet, and he was carrying a can of bear spray.   He exacerbated the plight of the beleaguered police officers by attacking them four different times with that bear spray.   He made sure the bear spray would get under their face shields.   The United States recommends that the Court sentence Oliva-Lopez to 63 months of incarceration for his violation of 18 U.S.C. § 111(a)(1).   A 63-month sentence reflects the gravity of Oliva-Lopez's conduct and the need for general and specific deterrence.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The United States refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 29, for a short summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Oliva-Lopez' Assaultive Conduct at the Capitol

On January 3, 2021, Oliva-Lopez traveled across the country from Portland, Oregon area to Washington, D.C. by car with a friend.[2]   The purpose of his trip was to participate in the "Stop the Steal" protests at the Capitol.

---

[2]  This individual was present at the riot on January 6th but has not been charged.

On January 6th, after attending the rally, Oliva-Lopez made his way through the West Plaza when it was already overrun with rioters.   *See* Images 1 & 2, below.



*Image 1 (above) – Oliva-Lopez (circled in yellow) on the densely crowded West Plaza; Image 2 (below) - expanded inset.*



At around 2:00 p.m., some of the rioters forced their way past the barricades and police officers.   The mob unlawfully advanced to the exterior façade of the Capitol building.    The certification proceedings were still underway and the exterior doors and windows of the United States Capitol were locked or otherwise secured.   Oliva-Lopez climbed up onto a stone balustrade adjacent to a set of stairs partially obstructed by the temporary scaffolding erected for the inauguration.   *See* Image 3, below.



*Image 3 – Oliva-Lopez (framed in yellow) climbing up onto a balustrade of the northwest stairway.*

This scaffolding was located well inside the restricted perimeter of the Capitol building and its grounds, and was not open to the public.   Oliva-Lopez then stood up on the balustrade facing the crowd below.   He appeared to be holding the can in his hand.   *See* Image 4, below.   After a minute

or two, Oliva-Lopez descended back down to the West Plaza.



*Image 4 – Oliva-Lopez (framed in yellow) holding a can (indicated by blue arrow).*

On the West Plaza, United States Capitol Police (USCP) and Metropolitan Police Department (MPD) officers were vastly outnumbered and struggling to maintain lines of defense. They were trying to prevent rioters from advancing further to the Capitol building. Loudspeakers were sounding an alarm and announcing to the crowd that anyone who continued to remain in the area could be subject to arrest and the use of riot control agents or impact weapons. It was under these circumstances that Oliva-Lopez assaulted officers on four distinct occasions. At the time of the assaults, Oliva-Lopez was wearing a blue plaid jacket, a beige-colored backpack, an olive-drab colored helmet, and a full-face respirator. He was carrying a can of UDAP brand bear spray.[3]

---

[3] The letters in the brand name, UDAP, stand for Universal Defense Alternative Products.

At approximately 2:04 P.M., Oliva-Lopez began assaulting officers with steams of orange-colored bear spray.   On each occasion, he aimed the stream of bear spray at the neck and face of the victim officer.   After each assault, Oliva-Lopez would scurry back into the crowd to await another opportunity.

At the time of the first assault, a small clearing had just opened up around several officers. Oliva-Lopez strode purposefully into middle of it and planted his feet about 5 feet away from Officer J.C.   He paused for a moment and looked for the right angle to attack the officer with the bear spray. *See* Image 5, below.



*Image 5 – Oliva-Lopez (framed in yellow) angles for his first bear spray assault against police officers; the bear spray can is indicated by the blue arrow.[4]*

---

[4] Image 5 is a screen capture from Exhibit 1, a publicly available Youtube video, at 19:53.

He then unleashed a stream of orange bear spray directly at Officer J.C.'s neck area.    Exhibit 1; *See* Image 6, below.



*Image 6 – Oliva-Lopez directing bear spray at the neck of Officer J.C. (bear spray shown by blue arrow).*[5]

As Officer J.C. turned his head away from the bear spray, some of it flew past his face and hit Officer E. G.-B., who was standing a few feet behind Officer J.C. and looking directly at Oliva-Lopez.    *See* Image 7, below.    The bear spray flew under both officers' face shields, coating them on the inside.

---

[5] Image 6 is a screen capture from Exhibit 1, a publicly available Youtube video, at 19:54.



*Image 7 – Orange bear spray flying past Officer J.C. and hitting Officer E. G.-B. (as shown by blue arrows).[6]*

Both officers reeled from the effects of the bear spray and immediately left the area to seek treatment for their eyes.   Exhibit 2; *See* Images 8 & 9, below.

---

[6] Image 7 is a screen capture from a publicly available video.



*Image 8 – Officer J.C. and Officer E. G.-B. reeling from the bear spray.*[7]

---

[7] Image 8 is a screen capture from Exhibit 2, a publicly available Cop Watch video, at 42:32.



*Image 9 – Officer E. G.-B. (left) and Officer J. C. (right), with their face shields coated with orange bear spray on the inside, trying to exit the area.[8]*

After deploying the bear spray, Oliva-Lopez deftly retreated into the mob.

      Oliva-Lopez's second assault against police took place about only 8 seconds later. Oliva-Lopez suddenly re-emerged from the mob into the same clearing. As he moved forward, numerous rioters on the edge of the clearing were recording his actions with phones, cameras, and video cameras. This time, Oliva-Lopez's intended victim was Officer A.I., who was standing at one end of a bike rack barrier. From about 10 feet away, and with his feet planted in an aggressive stance, Oliva-Lopez fired a stream of bear spray directly at the officer's head and neck area. Exhibit 3; *See* Images 10 & 11, below.

---

[8] Image 9 is an image that was publicly available on social media.



*Image 10 – Oliva-Lopez (right) firing bear spray at Officer A. I. (left); Officer's face shield indicated by the blue arrow.[9]*

---

[9] Image 10 (Exhibit 3) is an image that was publicly available from Imago-Images.



*Image 11 – Oliva-Lopez firing bear spray at Officer A. I. (out of view on right).*[10]

When Officer A.I. angled his face downward to protect his neck, the orange bear spray struck and covered and coated his entire face shield.   *See* Images 12 & 13, below.

---

[10]  Image 11 is a screen capture from Exhibit 2, a publicly available video from Cop Watch, at 42:41.



*Image 12 – Orange bear spray flying from Oliva-Lopez's spray can (indicated by blue arrow) toward Officer A.I., as seen from Officer's point of view.[11]*



*Image 13 – Orange bear spray covering and coating Officer A.I.'s face shield, as seen from the officer's point of view; black objects are Officer A.I.'s gloved hand and baton.[12]*

---

[11] Image 12 is a screen capture from the BWC recording of Officer A.I. at 14:04:52.

[12] Image 13 is a screen capture from the BWC recording of Officer A.I. at 14:04:52.

Oliva-Lopez desisted only after an officer on the mezzanine sprayed a chemical agent in his direction. *See* Image 14, below.



*Image 14 – Oliva-Lopez shirking away from a white mist of chemical agent (shown by blue arrows) deployed by an officer on the mezzanine.*[13]

Officer A.I. turned to seek attention for his eyes.    Again, Oliva-Lopez blended back into the crowd.

The clearing then filled with rioters.    Oliva-Lopez's third bear spray assault against the police occurred about two minutes after the second one.    After watching and waiting for the right moment, Oliva-Lopez wove through the crowd toward some officers lined up behind a bike rack barrier.    When he was about 5 feet away, he fired bear spray at an unknown officer directly in the face.    Exhibit 4; *See* Image 15, below.

---

[13] Image 14 is a publicly available image.



*Image 15 – Oliva-Lopez (framed in yellow) deploying a stream of orange bear spray (indicated by blue arrows) at an unknown officer (out of view to the left).[14]*

After quickly deploying the bear spray, Oliva-Lopez ducked and darted back into the mob.   Exhibit 4; *See* Image 16, below.

---

[14] Image 15 is a screen capture from Exhibit 4, a publicly available video.



*Image 16 – Oliva-Lopez (framed in yellow) ducking down to re-enter the crowd after his third bear spray attack on officers.*[15]

The vigor with which he conducts himself and his body language belie a level of enthusiasm and excitement for what he is doing.   Exhibit 5; *See* Image 17, below.

---

[15] Image 16 is a screen capture from Exhibit 5, a publicly available video, at 2:35



*Image 17 – Oliva-Lopez looking around after the third spray.[16]*

After a few seconds, he turned back around to see what havoc he was able to wreak.

About 20 seconds later, Oliva-Lopez deployed his bear spray a fourth and final time.   He advanced through the dense crowd toward the officers.   He extended his spraying hand above the heads of nearby rioters so as to get a clear shot at an officer on the line.   From just a few feet away, Oliva-Lopez directed a stream of bear spray at the officer's head, face shield, and neck area.   Exhibit 5; *See* Image 18, below.

---

[16] Image 17 is an expanded inset of a screen capture from Exhibit 5, a publicly available video, at 2:37.



*Image 18 - Oliva-Lopez (outlined in yellow) extending his hand and deploying a stream of orange bear spray at an unknown officer; the officer's helmet is indicated with green arrow.[17]*

Oliva-Lopez might have committed additional spray assaults but for the for the fact that he injured himself immediately after the fourth spray.   He appeared to have twisted his ankle, and nearly fell down.   Exhibit 5; *See* Image 19, below.

---

[17] Image 18 is a screen capture from Exhibit 5, a publicly available video, at 2:53.



*Image 19 - Oliva-Lopez (circled in yellow) grasping onto another rioter after injuring himself.[18]*

Image 20, below, shows Oliva-Lopez laying down on his side on a short flight of steps, resting his head on his backpack. His helmet and respirator are off. Other rioters are attending to him and asking for water on his behalf. *See* Image 20, below.

---

[18] Image 19 is a screen capture from Exhibit 5, a publicly available video, at 2:55.



*Image 20 - Oliva-Lopez (circled in yellow) lying on the steps.*

Financial records show that Oliva-Lopez purchased two 7.9-ounce cannisters of UDAP Bear Spray at a sporting goods store in Portland, Oregon, on December 22, 2020. Comparison of a picture of this item found on the store's website with the spray cannister seen in Oliva-Lopez's hand as he sprayed officers reveals that it is the same or similar product. *See* Image 21, below.

# UDAP 7.9 oz Bear Spray 2 Pack







*Image 21 – The bear spray product that Oliva-Lopez likely purchased and used.[19]*

When Oliva-Lopez was arrested on January 23, 2024, FBI agents seized his phone and later gained access to its contents.   Although  it was not the same phone that Oliva-Lopez carried on January 6, it contained images of the helmet, respirator, and backpack that Oliva-Lopez wore during the riot.   It also contained images of Oliva-Lopez posing at the Washington Monument on January 6, 2021 wearing the same clothes that he wore during the riot.

### Injuries

The  videos  indisputably  show  that  Oliva-Lopez  deliberately  fired  bear  spray  at  several

---

[19] Image 21 is a publicly available image.

officers at close range in a manner designed to injure them.      Officer A.I. felt a stream of bear spray forceful enough to push back on his face shield.   He recalled that the bear spray covered his face shield and contacted his face.   He experienced a burning sensation in his eyes which made it impossible to see.   He had to be guided off the line by another officer.   He described the pain as a 9 out of a possible 10.   He had to leave the line of service for approximately two to three hours and suffered lingering effects for two to three days afterwards.   For approximately six months afterward, the chemical agent that was saturated into his vest and helmet would become re-activated with sweat and wind.

Officer (now Sergeant) J.C. felt the bear spray go under his visor and hit his face.   He similarly experienced an immediate burning sensation (an 8 out of 10 on a pain scale), a partial blinding, and difficulty breathing.   He had to immediately leave the line of service.   He initially spent five minutes trying to wash the chemical agent out of his eyes.   But, when he put his helmet back on, the chemical agent re-activated and he was forced to go to an eye wash station inside the Capitol building.   He spent about twenty to thirty minutes there getting treatment.

Both officers report that the bear spray went under their face shields and contacted their faces directly.

## III.    THE CHARGES AND PLEA AGREEMENT

On July 26, 2024, the United States Attorney filed an Information charging Oliva-Lopez with one count of Assaulting, Resisting, or Impeding Certain Officers (18 U.S.C. §111(a)(1)).   (ECF No. 24)   On September 17, 2024, Oliva-Lopez pleaded guilty as charged pursuant to a written plea agreement.   (ECF No. 28)

## IV.    STATUTORY PENALTIES

Oliva-Lopez now faces sentencing on one Count of Assaulting, Resisting, or Impeding

Certain Officers in violation of 18 U.S.C. §111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Oliva-Lopez faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   As the parties agreed in the Plea Agreement, and as the Probation Office also agrees, the Guidelines analysis for this matter is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | 14 |
| Use of Dangerous Weapon (U.S.S.G. § 2A2.2(b)(2)(B)) (bear spray) | + 4 |
| Official Victim (U.S.S.G. § 3A1.2(b)) | + 6 |
| Bodily Injury  (U.S.S.G. § 2A2.2(b)(3)(A)) | + 3 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | - 3 |
| **Total Adjusted Offense Level:** | **24** |

*See* Plea Agreement ¶ 5(A).

The U.S. Probation Office calculated Oliva-Lopez's criminal history as Category I, which the parties do not dispute.   P.S.R. ¶ 55.   Accordingly, based on both the Probation Officer's and the parties' plea agreement, Oliva-Lopez's advisory Guidelines imprisonment range is 51 to 63 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration of 63 months.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Oliva-Lopez's felonious conduct on January

6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, thwarting the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Oliva-Lopez repeatedly and viciously attacked police officers who were trying to defend the Capitol building from an angry, violent mob. He contributed to the violence at a location where many officers suffered injuries during conflict resembling a medieval melee.

Oliva-Lopez did not just suddenly find himself in the middle of chaos. He drove from one end of the country to the other to immerse himself it. He went to the Capitol expecting and prepared to participate in political violence. He bought bear spray to use against other human beings. He had brought a helmet and a full-face respirator. At the riot, Oliva-Lopez used these items to protect himself from the *same* harm he intended to inflict on others. Instead of shying away from the chaos and violence of January 6th, he helped to cause it.

Oliva-Lopez perpetrated each spray assault like a hit-and-run attack. He would wait for just the right moment, then dart in and spray a purposefully focused stream, then scurry back into the crowd. He targeted the neck and face areas of each officer to ensure that the chemicals would circumvent the officers' protective gear.

The effects of the bear spray made it impossible for the victim officers to continue doing their duty. They were incapacitated and forced them to remove themselves from a struggling defensive line. Under those circumstances, they were extremely vulnerable to assault by other rioters.

The nature and circumstances of Oliva-Lopez' offense were egregious, and fully support the government's recommended sentence of 63 months.

**B. Oliva-Lopez's History and Characteristics**

Oliva-Lopez accepted responsibility for his conduct by pleading to an Information and has

been compliant with the terms of his bond.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports the recommended sentence. Oliva-Lopez's assaultive conduct on January 6 was the epitome of disrespect for the law. He assaulted vastly outnumbered officers on 4 distinct occasions, with a weapon, within the span of about 4 minutes. And the fact that he brought a respirator and bear spray to the riot shows premeditation.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[20] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a sentence of 63 months of incarceration.

Many individuals at the January 6th riot acted with anger and rage. Oliva-Lopez, however, appeared to act with enthusiasm. His disregard for the pain that fellow human beings would endure as a consequence of being exposed to the chemicals in bear spray is worrisome.

While Oliva-Lopez has accepted responsibility by pleading guilty to an Information, he has never expressed any remorse.[21] A defendant is not required to express remorse, but his failure to

---

[20] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[21] Any last-minute expressions of remorse should be viewed with skepticism. *See United States v.*

do so may be an indication that he does not regret what he did and is, therefore, at risk to engage in similar conduct in the future. A significant sentence is necessary to deter Oliva-Lopez from engaging in such conduct in the future.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

Had Oliva-Lopez been required to plead guilty to, or been convicted at trial of, multiple assault counts, his Total Offense Level and advisory Guidelines range would have been higher. *See* U.S.S.G. § 3D1.2(a) and (b) and § 3D1.4 (counts involving multiple assault victims do not group, resulting in a higher combined offense level than for grouped counts). It also is worth noting that Oliva-Lopez was not charged with a violation of 18 U.S.C. § 111(b).

---

*Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."  *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[22]

---

[22] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[23] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence in the following case provides a suitable comparison to the relevant sentencing considerations in this case.

*United States v. Julian Khater,* 21-cr-222 (TFH), featured conduct similar to that of Oliva-Lopez. Khater fired a chemical spray at least 3 officers who were manning bike rack barriers from a relatively close distance. Their forced retreat from the riot contributed to the police line being overrun by rioters. Like Oliva-Lopez, Khater expressed no remorse for his use of pepper spray to assault police officers. Khater pled guilty to violations of 18 U.S.C. § 111(a)(1) & (b), and so, had a higher Guidelines range than Oliva-Lopez. Judge Hogan imposed 80 months' incarceration.

In *United States v. Daniel Caldwell,* 21-cr-181 (CKK), the defendant was on the West Plaza for an extended time. There, he taunted and verbally challenged officers trying to maintain defensive lines at the top of a short flight of stone steps. Caldwell deployed multiple streams of chemical spray at the officers. He then ascended to the Upper West Terrace and briefly entered the Capitol building via the Senate Wing Door. After the riot, in a private interview at a nearby hotel, he admitted having sprayed fifteen police officers. Like Oliva-Lopez, Caldwell came to the Capitol building on January 6 primed for battle. A Marine Corps veteran, Caldwell wore a

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[23] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

camouflage military-style backpack and protective glasses. He pled guilty to violations of 18 U.S.C. § 111(a)(1) & (b), so his Guidelines range was higher than Oliva-Lopez's. Judge Kollar-Kotelly sentenced Caldwell to 68 months' incarceration.

In *United States v. Barry Ramey,* Case No. 22-cr-453 (DLF), Ramey used chemical spray to assault officers at the base of the northwest scaffolding under which there was a stairway to the Upper West Terrace. Ramey sprayed two officers, forcing them to yield to the mob, which advanced up the stairs. Ramey, who was a Proud Boy, was remorseless. He was convicted after a bench trial of several charges, including 18 U.S.C. §111(b) and 18 U.S.C. § 231(a)(3). Judge Friedrich imposed a sentence of 60 months' incarceration.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[24] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18

---

[24] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

U.S.C. § 3663(a)(3).   *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Oliva-Lopez must pay $2,000.00 in restitution, an amount which reflects the role Oliva-Lopez played in the riot on January 6th as a whole.[25]   Plea Agreement ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July, 2023.   *Id.*   (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)   Oliva-Lopez' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.   P.S.R. ¶ 100.

## VIII.   FINE

Oliva-Lopez's conviction for a violation of 18 U.S.C. §111(a)(1) subjects him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.   U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Oliva-Lopez to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

---

[25] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Here, Oliva-Lopez has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine.  § 5E1.2(a), (e).  The Guidelines fine range here is $15,000 to $150,000 U.S.S.G. § 5E1.2(c).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 63 months of imprisonment, 36 months of supervised release, $2,000 in restitution, a fine, and the mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    _/s/   David J. Perri_____
DAVID J. PERRI
WV Bar No. 9219
Assistant United States Attorney (Detailed)
United States Attorney's Office