**Peyton Lee, OSB No. 164224**
**Assistant Federal Public Defender**
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: peyton_lee@fd.org

**Attorney for Defendant**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 1:24CR00343-001 |
| **Plaintiff,** | |
| vs. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **ANDY OLIVA-LOPEZ,** | |
| **Defendant.** | |

     Mr. Oliva-Lopez was 24 years old on January 6, 2021. He is a young man who had a difficult and unstable upbringing. He witnessed and experienced physical and verbal abuse from his two parents, who were each involved in the criminal justice system and repeatedly deported. He and his siblings were passed among family members and often lacked stable role models, support, and housing. Despite his difficult upbringing, he has worked hard and been a good employee as a machinist; he has a close and loving relationship with his sisters; and his mother has managed to stabilize and provide a loving home as he has become an adult.

     The events of January 6, 2021, do not reflect the person Mr. Oliva-Lopez has been in his life; he has no criminal history, has quickly taken responsibility for his conduct, and has

**Page 1 Defendant's Sentencing Memorandum**

complied with his pretrial conditions while out of custody on this charge. He understands his actions that day were criminal and caused harm, and that there are consequences for his conduct. However, in light of his age, personal background, lack of criminal history, and comparison with other similarly situated defendants, a sentence of 12 months and one day in the Bureau of Prisons followed by three years of supervised release is a sufficient but not greater than necessary punishment. He will suffer the stigma and collateral consequences of a felony conviction, spend his first period incarcerated in any custody facility in the federal Bureau of Prisons, and lose significant time with his family. This Court will be able to supervise Mr. Oliva-Lopez and ensure his time back in the community is safe and productive.

**ADVISORY GUIDELINE CALCULATION**

There is no dispute between the defense and the government about the advisory guideline calculation. First, Mr. Oliva-Lopez has no criminal history and is therefore in Criminal History Category I. Second, the Offense Level for the charge is as follows:

| COUNT 1: 18 U.S.C. § 111(a) | |
|---|---|
| Base offense level, § 2A2.2(a) | 14 |
| Dangerous Weapon, § 2A2.2(b)(2)(B) | +4 |
| Bodily Injury, § 2A2.2(b)(3)(A) | +3 |
| Official Victim Adjustment, § 3A1.2(a)(b) | +6 |
| Acceptance of Responsibility | -3 |
| Adjusted Offense Level | 24 |
| Criminal History Category | I |
| Advisory Guideline Range | 51-63 months |

**Page 2 Defendant's Sentencing Memorandum**

The defense is free to seek whatever sentence is reasonable. Here, the defense recommends a sentence of 12 months and one day in custody.

**RESTITUTION AND FINE**

The parties agreed that Mr. Oliva-Lopez should pay at least $2,000 in restitution to the Architect of the Capitol, along with the required $100 fee assessment. The Government seeks imposition of a fine.

A further fine is not warranted. Mr. Oliva-Lopez qualified for court-appointed counsel in this case. In addition, he provided financial information to the probation office. The Presentence Report (PSR) reflects that Mr. Oliva-Lopez does not have a significant income, that he shares a small home with his three sisters and mother, and that he does not have any significant assets. The PSR notes, "[b]ased on the defendant's reported finances, and potential imprisonment sentence, it appears he is not able to pay a fine, in addition to restitution." ECF 42, PSR at ¶ 80. The government did not object to the PSR or any of these findings. The probation office is not recommending a fine be imposed in this case. ECF 43. Mr. Oliva-Lopez has made a sufficient showing that a fine is not appropriate in this case.

**DEFENSE SENTENCING ARGUMENT**

This Court's consideration of the sentencing guidelines, the sentencing factors found in 18 U.S.C. § 3553(a) as applied to Mr. Oliva-Lopez, warrant a sentence of twelve months and one day in the Bureau of Prisons, followed by a term of supervised release. The sentencing guidelines are, of course, only advisory. *See United States v. Booker*, 543 U.S. 220, 245 (2005). While a sentencing court must consider the guidelines range in fashioning a sentence, in the end, the "overarching" consideration is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing[...]." *Kimbrough v. United States*, 552 U.S. 85,

**Page 3 Defendant's Sentencing Memorandum**

101 (2007). As stated by the Supreme Court, in the final analysis "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 488 (internal quotation and citation omitted).

The sentencing factors under 18 U.S.C. § 3553(a) call on this Court to fashion a sentence that is "sufficient, but not greater than necessary" to meet four goals: just punishment, deterrence, protection of the community, and rehabilitation. Further, under 18 U.S.C. § 3582, the court, in considering the factors in § 3553(a) and their applicability, should recognize "*that imprisonment is not an appropriate means of promoting correction and rehabilitation.*" 18 U.S.C. § 3582(a) (emphasis added).

> As just noted, that section instructs courts to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." A common—and in context the most natural—definition of the word "recognize" is "to acknowledge or treat as valid." Random House Dictionary of the English Language 1611 (2d ed.1987). And a thing that is not "appropriate" is not "suitable or fitting for a particular purpose." Putting these two definitions together, § 3582(a) tells courts that they should acknowledge that imprisonment is not suitable for the purpose of promoting rehabilitation. And when should courts acknowledge this? Section 3582(a) answers: when "determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, [when] determining the length of the term." So a court making these decisions should consider the specified rationales of punishment except for rehabilitation, which it should acknowledge as an unsuitable justification for a prison term.

*Tapia v. United States*, 564 U.S. 319, 326–27 (2011) (internal citations omitted). Here, Mr. Oliva-Lopez should receive a variance from the guidelines, as the applicable § 3553(a) sentencing factors support a below guidelines sentence of twelve months and one day in the Bureau of Prisons in his case.

### A. Mr. Oliva-Lopez's difficult upbringing, trauma, and familial instability must be taken into account in crafting an appropriate sentence under §3553(a)(1).

Mr. Oliva-Lopez's difficult childhood started even before he was born; his mother Vilma Lopez reports that "we both almost died during birth."[1] She had insisted on a natural birth but ultimately needed a C-section and believes she was given too much anesthesia.[2] Although Andy was born in San Francisco, the family moved when he was 6-months old to Alaska for his father's dangerous work on fishing boats. Shortly thereafter, Andy contracted pneumonia and had to be hospitalized for several days. Life in Alaska was "very difficult,"[3] isolated, and further complicated by ongoing domestic violence against Vilma at the hands of Andy's father. Eventually, around 1998, they all moved to the Portland, Oregon, where Andy's two younger sisters were born.[4]

Vilma's relationship with Andy's father did not improve in Portland. Andy's older sister Ashley remembers physical and verbal abuse between their parents and against the children.[5] Ashley called the police on their father when she found him choking their mother in the garage.[6] He would go to jail, get deported, return to the United States, and then go back to prison[7] (in one case for three-years on federal drug charges[8]). The children remember uncomfortable visits to the prison where their father was incarcerated, going inside while their mom remained outside.[9]

---

[1] Exhibit A, Investigative Report with Vilma Lopez, at 1.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] Exhibit B, Investigative Report with Ashley Navarro, at 1.
[6] Exhibit A, at 2.
[7] Exhibit B, at 1.
[8] Exhibit A, at 2.
[9] Exhibit B, at 1.

**Page 5 Defendant's Sentencing Memorandum**

Eventually, Vilma stopped trying to mend the relationship, and their dad fell out of their lives.[10]

Despite the ongoing abuse in the household, the children were never formally removed from the home, and Ashley does not recall their school or anyone else ever reporting the abuse they suffered.[11] They did, however, spend time living with their aunt and many cousins in the Portland area when their mother was either in jail or deported.[12] (As Mr. Oliva-Lopez reports in the PSR at ¶52, both parents engaged in drug dealing when he was younger.) On another occasion, their mother sent the children to Honduras to live with her mother "because I did not have no one else for them" after she was arrested for shoplifting and then detained by immigration.[13]

Unsurprisingly, the instability Andy suffered at home bled over into difficulty at school. His mother recognizes how hard her time in custody was for them:

> Ms. Lopez declared that her children suffered lots during the time she was in detention. "I was the only person they had. They needed my attention. They had to take care of themselves." Ms. Lopez said that Ashely was 14, and she fed them, bathed them, put them to bed. She said that their grades in school went down during this time. She remembered that Andy gave her a big hug and cried when she came home.[14]

The frequent moves caused instability for Andy, and his mom estimates that he went to about four different schools.[15] His sister Jennifer recalls that it was difficult for him, and that Andy often had a rough time getting to school.[16] She believed he was smart, but the environment was

---

[10] *Id.* at 2.
[11] *Id.* at 1.
[12] *Id.* at 1-2.
[13] Exhibit A, at 2.
[14] *Id.*
[15] *Id.*
[16] Exhibit C, Investigative Report with Jennifer Oliva, at 1.

**Page 6 Defendant's Sentencing Memorandum**

hard for him, and he ultimately finished high school at an alternative school.[17]

His mother acknowledges that he was diagnosed with ADHD at a young age (5 or 6), but she believed he was "just being a boy and would grow out of it" and therefore did not give him the prescribed medication.[18] As a result, Andy struggled at school and had lots of energy. "It was difficult for him to focus on something."[19] His sister remembers him getting in trouble regularly for "outbursts of energy" and recalls a 1st grade teacher describing him getting up on the tables and dancing on them, and a bus driver complaining that he would move around the bus constantly and get under the seats.[20] Although his teachers told his mom about his ADHD as well, she declined to take him to treatment.[21] (The diagnosis was later confirmed by a therapist in 2017 or 2018.[22]) His sister Jennifer wonders if it is this untreated impulsivity that contributed to his conduct on January 6, 2021.[23]

Despite these difficulties, Mr. Oliva-Lopez has managed to forge a positive and productive work history. He is extremely industrious. It's likely that the experience of profound instability at a young age has contributed to a strong work ethic. As his mom and sisters report, he is a "responsible, hard-working man." [24] He pays his bills and often has two jobs at a time.[25] "He does not go out partying, he does not hang out in the streets."[26] His sister Ashley recalls Andy starting to wash dishes at Sizzler when he was a senior in high school, going on to work at

---

[17] *Id.*
[18] Exhibit A, at 2.
[19] *Id.*
[20] Exhibit B, at 2.
[21] *Id.*
[22] *Id.*
[23] Exhibit C, at 2.
[24] Exhibit A, at 2.
[25] *Id.*; Exhibit B, at 2.
[26] *Id.*

**Page 7 Defendant's Sentencing Memorandum**

temp companies and then getting machinist jobs.[27] When his stepfather passed away a few years ago, he helped his mother move back to Oregon from Arizona and assisted her financially. He always gives his mom any extra money if he has it.[28] Jennifer recalls that he paid for groceries for Thanksgiving dinner to ensure that his mom and sisters would not have to worry about it.[29]

> **B.  Mr. Oliva-Lopez has taken responsibility for his actions and complied with pre-trial release conditions.**

Mr. Oliva-Lopez accepted responsibility in this case early on and agreed to waive indictment and the Grand Jury process for the charges (ECF 30). Additionally, his plea agreement includes an agreement to cooperate with additional investigation, should it have been requested (ECF 28, at 2). The parties agree he has accepted responsibility, which is also reflected in his conduct before the Court and his time on pre-trial release.

The Government emphasizes in their sentencing filings that Mr. Oliva-Lopez has not expressed "remorse," but also goes on to say that such expressions at this stage "should be viewed with skepticism." The Court should instead look to Mr. Oliva-Lopez's conduct. Unlike so many of the defendants from January 6th, there is no indication that Mr. Oliva-Lopez boasted, gloated, or posted congratulatory remarks related to the events of the day on social media. He did not profit from his presence there, give interviews or engage in other piling on. He did not engage in delay tactics or obfuscate or destroy evidence. What he did was comply fully with his pretrial conditions, quickly accept responsibility on these charges without requiring the Grand Jury process, proceed with a change of plea without incident, and seek to address his behavior through the formal channels of resolving his criminal matter.

---

[27] *Id.*
[28] Exhibit C, at 2.
[29] *Id.*

**Page 8 Defendant's Sentencing Memorandum**

Mr. Oliva-Lopez's family has noted that not all defendants have the same eloquence or comfort in addressing emotionally charged issues. Each of his family members talks about how Mr. Oliva-Lopez struggles to "open up about stuff,"[30] and that it is "hard for [him] to express his emotions."[31] They attribute this to an incredibly traumatizing and abusive childhood which he has still not processed.[32] Sometimes it is our actions, and the people around us, who can speak more eloquently than we are capable of expressing ourselves: his sister Jennifer describes that he did not go to work for a full week after his arrest and that he feels guilty.[33]

    **C.**    **The collateral consequences and significance of a first prison term of 12-months will adequately accomplish the legitimate goals of sentencing under 18 U.S.C. § 3553(a).**

This Court is assessing the needs for deterrence, punishment, protection of the public, and rehabilitation in deciding whether to impose a term of imprisonment and, if so, for how long. A critical factor here is that the defendant has no prior criminal record and was relatively young at the time of his offense. He had an incredibly difficult upbringing and has managed to persevere and be a hard worker and supporter to his mom and sisters. His behavior on January 6th has already resulted in life-changing consequences: a felony conviction, a year under court supervision, and embarrassment in his community as a lawbreaker. In our proposal, he will spend a significant portion of time in custody for the first time in his life and will be housed in a federal Bureau of Prisons facility, a significant escalation for someone with no prior criminal history.

---

[30] Exhibit C, at 2.
[31] Exhibit B, at 3.
[32] *Id.*, at 1.
[33] Exhibit C, at 2.

**Page 9 Defendant's Sentencing Memorandum**

In *Pepper*, the Supreme Court elaborated on how post-offense rehabilitation reflects on almost every single sentencing factor under § 3553(a). *Pepper*, 562 U.S. at 491-93. Here, there is no reasonable concern regarding safety in the community, and rehabilitation, to the extent needed, has been accomplished. Deterrence and punishment have been accomplished through the felony convictions and restrictions for the last year, as well as the proposed term of 12 months of incarceration. The requested sentence is sufficient, but not greater than necessary, to accomplish the legitimate goals of sentencing.

> **D.** **Comparison to other individuals facing similar charges makes clear the government request and sentencing guidelines would result in unwarranted sentencing disparities and not accurately reflect the seriousness of the offense.**

The government seeks to compare Mr. Oliva-Lopez with other persons convicted in the January 6th prosecution; however, these comparisons fail to account for significant differences:

Julian Khater, 21-cr-222-TFH (ECF 39 at 28), pled to a higher offense of 18 U.S.C. § 111(b), with higher Guidelines than Mr. Oliva-Lopez. Additionally, Mr. Khater was specifically charged with assaulting Capitol Police Officer Sicknick, who died the day after the attack.[34]

Daniel Caldwell, 21-cr-181-CKK (ECF 39 at 28), once again, pled to higher level offenses than Mr. Oliva-Lopez, agreeing to 18 U.S.C. § 111(b) violations, which provide higher Guidelines. He also taunted and verbally challenged officers, admitted to spraying 15 police officers, and critically, entered the Capitol Building.[35]

---

[34] https://www.npr.org/2023/01/27/1152111889/khater-sentenced-prison-pepper-spraying-officers-jan-6
[35] https://www.justice.gov/usao-dc/case-multi-defendant/file/1378486/dl

Barry Ramey, 22-cr-453-DLF (ECF 39 at 29), engaged in conduct significantly more aggravated than Mr. Oliva-Lopez. Ramey went to trial, refusing to accept responsibility, unlike Mr. Oliva-Lopez. Further, he coordinated with a large group of Proud Boys who circled the Capitol, "casing" the grounds for weakness in security perimeters, and eventually joined an initial group that pushed officers back to the stairwell; it was in this context of coordinated, frontal attack on the officer lines that Ramey pepper sprayed multiple officers, and later celebrated "what they had accomplished."[36] Even Mr. Ramey received less time than the Government asks for here.

The government briefly references the table of sentences imposed in other Capitol breach cases. ECF 39 at n. 23. A more exhaustive review is provided in enclosed Exhibit D, which outlines a number of far more aggravated cases that received lesser sentences than what the Government requests for Mr. Oliva-Lopez, as well as a number of comparable cases that received sentences reflecting the defendant's request here. By way of illustration, the defense offers the following, in brief (all defendants listed below were convicted of 18 U.S.C. 111(a), like Mr. Oliva-Lopez):

- Kaleb Dillard 1:23-CR-00049-JMC – 10-month sentence after forcing his way into Capitol buildings, throwing an officer to the ground, and repeatedly shoving a second officer so that more rioters could enter.[37]

---

[36] https://www.justice.gov/usao-dc/pr/florida-man-sentenced-felony-charges-actions-during-jan-6-capitol-breach
[37] https://www.justice.gov/usao-dc/pr/alabama-man-sentenced-assaulting-law-enforcement-during-jan-6-capitol-breach

Page 11        Defendant's Sentencing Memorandum

- Philip Young, 1:21-cr-00617-DLF – 8 months for using a bike rack on officers (and an additional felony offense, and five misdemeanors for actions including letting air out of government vehicles).[38]

- Michael Lockwood 1:23-CR-00146-RDM – 12 and a day, after using a flagpole to strike MPD officers, grabbing and wresting a police baton away from an officer, and bragging about getting into "a fight with the cops."[39]

- Bobby Russell 1:23-CR-00029-APM – 12 and a day, after grabbing an MPD officer's jacket and pulling him down with him as he fell down a flight of stairs.[40]

- Bruno Cua 1:21-CR-00107-RDM – 12 and a day, *after trial,* after arming himself with an asp, entering the Capitol building, wandering around calling, "Where the swamp rats hiding at?" and violently shoving officers in order to enter the Senate Floor and prevent USCP officers from locking the doors.[41]

- James McNamara 1:23-CR-00119-ABJ – 12 months, after lunging at and swinging fists at officers, and using a bike rack to ram doors open.[42]

---

[38] https://www.justice.gov/usao-dc/pr/new-jersey-man-sentenced-assaulting-officers-and-other-charges

[39] https://www.justice.gov/usao-dc/pr/ohio-man-sentenced-felony-charge-actions-during-jan-6-capitol-breach#:~:text=Michael%20Scott%20Lockwood%2C%2032%2C%20of,officers%20on%20July%2024%2C%202023.

[40] https://www.justice.gov/usao-dc/pr/alabama-man-sentenced-assaulting-law-enforcement-during-jan-6-capitol-breach-0

[41] https://www.justice.gov/usao-dc/pr/georgia-man-sentenced-actions-during-jan-6-capitol-breach#:~:text=Bruno%20Joseph%20Cua%2C%2021%2C%20of,36%20months%20of%20supervised%20release.

[42] https://www.justice.gov/usao-dc/pr/illinois-man-sentenced-assaulting-law-enforcement-during-jan-6-capitol-breach-0

**Page 12**     **Defendant's Sentencing Memorandum**

- Ricky Willden 1:21-cr-00423-RC – 24 months, after spraying multiple officers with chemical irritants, throwing the canister at the officers, entering the Capitol Building and remaining for 18 minutes, then gloating on Facebook that "they got the message[.]"[43]
- Joshua Hernandez, 1:22-CR-00042-CRC – 24 months, after hitting officers in the head with flagpole.[44]

**CONCLUSION**

In the four years since the events that bring Mr. Oliva-Lopez before the Court today, Mr. Oliva-Lopez has been successfully living in the community both before his arrest and since his release in January of 2024. Mr. Oliva-Lopez will be adequately punished and deterred from any further unlawful action by a sentence of 12 months and one day of incarceration, followed by a three-year term of supervised release. Any greater prison sentence in this case is unnecessary, disproportionate compared to similarly situated defendants, and does not serve the goals of sentencing.

Respectfully submitted this 8th day of January, 2025.

*/s/ Peyton Lee*
Peyton Lee, OSB No. 164224

---

[43] https://www.justice.gov/usao-dc/pr/california-man-sentenced-two-years-prison-assaulting-officers-during-jan-6-capitol-breach
[44] https://www.justice.gov/usao-dc/pr/texas-man-sentenced-felony-charges-related-jan-6-capitol-breach

**Page 13**    Defendant's Sentencing Memorandum